We'll begin by hearing argument in the two cases that we will hear simultaneously, State of New York et al. v. United States Department of Justice and Make the Road New York v. Cuccinelli. May it please the Court, Jerry Synstad, appearing on behalf of the United States. Good morning. Good morning. The District Court's injunctions are flawed in several respects and should be set aside. As a threshold matter, plaintiffs have failed to assert a recognizable injury, and they seek to promote an interest that is diametrically opposed to the purpose of the public charge statute. They therefore lack standing. On the merits, as the District Court found – or I'm sorry, as the Ninth Circuit found, the rule easily is a reasonable interpretation of the public charge provision. Congress made clear in 1996 that it sought to ensure that aliens admitted to the country do not rely on public benefits. But didn't it do that by making them ineligible, for the most part, for those benefits? Your Honor, yes, it did, of course, make them ineligible. The fact that Congress concluded that, yes, after you've been here for a certain number of years, you are eligible for benefits, that simply reflects the fact that you can't predict with perfect accuracy who will need benefits. But it does not suggest – you know, it's Congress saying, look, if you've been here for – I thought you were trying to predict. The whole point of this regulation is to try to predict who's going to be eligible. Correct, yes, Your Honor. Let me back up for a second here. I think there's a difference between Congress saying we didn't predict you would use benefits, but circumstances have befallen you over – in the past five years, and therefore we're going to authorize you to use benefits. That's because you've been here for a while, you haven't been using them, and so forth. Well, no, they've been there for a while and they haven't been using them because they weren't eligible for them until this point. That's right. And they haven't been using them, and at that point Congress can say, look, we didn't expect you five years ago to be using them. But why do you say Congress was thinking that? Congress had every opportunity to elaborate on the public charge provision, and instead they ignored that, notwithstanding that the BIA had 20 years before taken a rather restrictive view of who is a public charge, and instead they chose to deal with the problem in a different way. So I'm trying to understand how you draw from the fact that Congress chose to deal with this problem, which they – I think it's absolutely correct – they perceived to be a kind of problem, that they didn't want to create an incentive for people to come here and get benefits, and they dealt with that by making people ineligible for the benefits, anyone but green card holders at all, and green card holders for the first five years after they get a green card. I just want to be clear, just before answering your question, on one factual point. Congress amended the statute most recently in 1996. It wasn't until 1999 that the INF at the time developed a more restrictive primary support. Well, I'm not sure I understand that. I thought they had ruled very similarly back in 1974, and I'm not even talking about the history of everything from 1882 until 1996. I'm not sure which case in 1974. In 1977 in the Vindman case, for example, the BIA found that the term had varied interpretations, was ambiguous, and didn't have a subtle meaning. So that's a later point. In the 1999 guidance, the BIA said that the term is ambiguous and didn't have a subtle meaning. So I don't think at any point in the history has Congress thought that the term had a subtle meaning. At what point was there ever judicial interpretations or administrative interpretations that in any way took the view that receipt of any kind of public benefits was the test, as opposed to being dependent for your basic support or being unable to work? Your Honor, I would point this court. One example is the Matter of B case, a seminal case from 1948, decided by the BIA and approved by the Attorney General, in which it was about deportation, but the BIA and NAG made clear that someone— Which case are you talking about? The Matter of B, or In Re B, in which the court said—I'm sorry, it wasn't a court. The BIA said, if you fail to repay transportation or clothing or other, quote, incidental expenses, then you are deportable as a public charge. Wait, wait, wait. First of all, the person in that case was clearly someone who qualified to be a public charge under a much more restrictive test that had existed before. She was mentally ill. There was no particular prospect of her recovery, and she was confined to a mental institution. And what the BIA said was, even for someone like that, if the hospital had not actually billed her for any of these services that they were providing, which amounted to her entire support, she still wasn't to be considered a public charge. And you're saying that is what is the best decision that favors your interpretation? No, I mean, first of all, it's true she was institutionalized, obviously, but in no way did the BIA's decision turn on that. But the BIA's decision was to not find her a public charge. But it made clear that if she had failed to repay clothing and transportation, incidental expenses, she would have been found, even though her institutionalization wasn't repaid, none of that was repaid. And I'd also point out there are other cases. The Turner case we point out where someone was hospitalized for two weeks and the court found that that temporary period of time was enough to, if that happened again, the person would be a public charge. Similarly, there are a number of cases of bootleggers, for example, in the 20s, who the fear was they might be imprisoned for a short period of time, and that was considered someone to be a public charge. And I would face your citing just seems to be strong authority against everything you're saying. I mean, it says, to illustrate, an alien who participates without cost to him in an adult education program sponsored by the state does not become a public charge. You're saying the opposite of what you're saying. I disagree, Your Honor. I think that particular passage Your Honor is quoting from is talking about benefits in general that are available to the public at large that are not means tested, and those have never been considered, and they're not considered under the rule. And I do want to emphasize, I think it's important, that in this rule, the agency considered the universe of possible benefits and narrowed it down to just three benefits here, Medicaid with exceptions, food SNAP program, and housing vouchers. So just those three basic necessities, food, shelter, and medical care. It didn't say any amount of those benefits. It then narrowed it further by saying you have to be expected to use them. Let me ask you something. Your proposition is, not your proposition, I mean, the proposition that supports the validity of this rule is that a person who needs the public assistance, and I'm quoting from the passage at 41366, a person who needs the public assistance to provide these basic necessities of life and receives such benefits for longer periods of time is more likely to receive such benefits in the future, correct? That's the justification for the rule? Now, where do you get the proposition that the person in question needed those benefits? Well, in my experience, people take what's available to them. I take tax deductions. Do I need the tax deductions? No, I don't need them. I take them because they're available to me. A person who is eligible to receive benefits, a person who is eligible to receive medical care for free is likely to take what he can get for free for free, rather than pay for it without need for it. Where do you get the justification for the proposition that anybody who took something that was available to them for free needed it? I guess I'd say a couple of things, Your Honor. What? A couple of points. Yeah. First, on that rationale, and I don't even think plaintiffs would agree with this, that any public benefit, receipt of any public benefit would not count. So you could be on institutionalized at the government's expense. That wouldn't count because that's been authorized. Or you could use cash assistance, which plaintiffs agree, I think. That is something that can be considered. But isn't there a difference between SSI, which is provided because someone is disabled and unable to work, and, for example, SNAP, otherwise known as food stamps, which can be available to somebody who has a full-time job? Your Honor. You're saying that somebody who works full-time at minimum wage and still qualifies for a minimal amount of food stamps, because, of course, you get fewer food stamps as your income rises, but who is above the poverty line and receives, say, $10 a month in food stamps, is likely to become or is a public charge? Your Honor, I do want to address the fringe cases because obviously on average it's much higher than that. But before even turning to that particular case. It's very generous, I know. It's practically wealth by the time you're done with your food stamps. But go ahead. Congress could not have been clearer in 1996 that it did not want aliens relying on public benefits to meet their basic needs and did not want them to serve as an incentive, and it didn't differentiate between the type of non- It could have been clearer. It could have said you can't get them. Right, but again. Congress could not have been clearer. That's just not true. But in any event, the issue is not whether Congress would have preferred not to be giving public benefits to these people. The issue is whether the fact that they took the public benefits is a proper basis for making them inadmissible. These are just a select group of benefits going to basic needs, and the point being if you cannot meet your basic needs based on Why is it called supplemental if it is necessary for your basic needs? It is not for your basic needs. SNAP is not for your basic needs. It is a supplemental program that is intended to provide additional nutrition to people because apparently Congress thought it was a good idea for people to eat better. Well, I'd also point out in 1996 Congress also passed, for example, the Affidavit of Support Provision, which excludes people if they don't find a sponsor whose income is deemed to be part of the alien's income for benefit purposes. But Congress did all of those things as part of an integrated package to deal with the problem, and it did that in the 1990s. And now you're coming along 20 years plus later and saying, oh, what they really wanted us to do was to alter the interpretation of public charge to make clear that anybody who gets these benefits, even when Congress has authorized them to get those benefits or anyone who is likely to apply for those benefits, when Congress has said they can get the benefits, should be kept out of the country in the first place for fear that they will get what Congress decided to let them have, not just what Congress already said they can't have. Well, again, I don't even think plaintiffs would agree that. I don't care what plaintiffs would agree. I want to know what your position is and what your answer to my question is. I'm happy the case that Congress authorizing a benefit means that it can't be considered for public charge purposes because that would mean no public benefits can ever be considered. No, no, no, that's not the proposition at all. The proposition is you are trying to draw an intention of Congress to do something that it did not do from something else that it did do and that it apparently thought was the way to deal with the problem that you correctly point out Congress perceived. Well, again, I know this isn't a direct answer, but Congress, and I think the legislative history, statutory history is quite clear, that Congress left the discretion of the executive branch. There are any number of examples of that. They specified in 1950 that this was to be made in the opinion of the executive branch. In 1996, they set out a series of five factors that, at a minimum, the agency is intended to consider. So I think it's quite clear, and Congress surveyed the history and said it's ambiguous and so forth, so quite clear that Congress thought of the term as ambiguous and open to interpretation and left it to the interpretation of the executive branch. Now, this is, of course, a change from what the agency had done, but when you consider all of the methods Congress used in its clear intent that aliens admitted to the country not use and rely on public benefits, all we're asking is that the court find that this is a reasonable interpretation, not the only one, not, you know, that there is some that were foreclosed or were not, that there's a clear meaning or that this is the only meaning that could be adopted, but it's a reasonable one. And given Congress's clear intention, given the various provisions, I mean, we cite a number of them in our briefs, that also make clear that Congress was very concerned about allowing individuals to be admitted to rely on benefits. And simply that they authorized them, again, is just a fact of Congress recognizing that some people will be admitted who are not found to be public charges but will fall on hard times, and once they've been here for a while, Congress said, yeah, okay. But if we expect you to use them at the start, there's no reason to not exclude those. It's not inconsistent with congressional intent to exclude those. How are medical benefits treated in this? Well, certainly Medicaid, there are exceptions for emergency Medicaid. Certainly there are exceptions for certain other services provided by Medicaid, but typically Medicaid, expected Medicaid uses would be included as a, you know, if you're expected to use Medicaid for more than 12 months out of a 36-month period, you would be considered a public charge, and if you've used it in the past. Now, I do also want to emphasize that this is, of course, a totality of the circumstances test. So in answer to Your Honor's question earlier about a small amount of benefits, any adjudicator is going to have to rationally explain, not based on speculation, why they think this person is likely to become a public charge and the likelihood that they would find, oh, I think in six years you're going to be using a very small amount of SNAP benefits. It's hard to see as a practical matter what basis they would have for finding that and how that could be defended because, again, they're considering the totality of the circumstances. Isn't the standard for who is a public charge someone who will have and will take these benefits? I agree that that is a standard, but it has to be. Well, but then how could the adjudicator, an administrator, a bureaucrat, someone in the Border and Customs Protection when someone arrives at the airport, someone in the consular office who I gather the State Department has adjusted there, and then thankfully because you wouldn't want to have different standards being applied and people get a visa from the State Department and then get turned away at the border, but they're applying the same thing in advance. How can that person justify if the conclusion is we predict that the person is going to likely benefit from the food stamp program? Isn't the answer under the regulation that they can't be admitted? Your Honor, yes. Whether it's $10 worth or $190 a month worth, the maximum, for one year, at some point in the future they are to be turned away. That's true, but, again, it is a totality of the circumstances test. Well, it's a totality of the circumstances test to decide whether it is likely that the person will take advantage of that program for a period of 12 months or take advantage in the case of some temporary setback in need of two programs during six months at any point in their life. If that is likely, if that is the best guess based on the totality of the circumstances, the rule says no visa. Is that wrong? That's correct, Your Honor. Even if it's $10 worth, even if it's one or two non-emergency hospital stays that get covered by Medicaid, if you predict that that's going to happen at some time in the future, along with getting a few food stamps for a period of six months for the two programs, out. Your Honor, yes, that is how the rule works, but all I'm saying is that I asked you just following up on sort of a hot-button topic, but does this have an impact on women of childbearing age who, by virtue of being women of childbearing age, may have children or may need prenatal care? Your Honor, that was an issue that was raised by commenters after the proposed rule was announced, and the agency responded by excluding Medicaid services provided to pregnant women even after birth for a few months and for children. So, no, you won't count any benefits, past benefits in that regard, that are used against someone. So that is an exclusion. To get back to Your Honor's question, I just want to be clear. Just ask a follow-up of Judge Hall's question. The exclusion, I gather from what you said, does not apply to women who need medical care following delivery because, for example, of postpartum depression? Your Honor, I believe it extends for a few months after birth. I should know the answer specifically, but I believe it does carry at least for a few months after birth. One other clarification. You say it's a totality-of-circumstances test, but isn't it correct that having used the benefits in the past for a sufficiently long period is a heavily weighted factor? It is. Now, because it's a totality-of-circumstances test, if you can explain that usage, for example, I'm now employed, I don't expect to use it in the future, you know, I have other means, that would be taken into account, or if it was a long time ago and so forth. So it is not a determinative factor. It's a heavily weighted factor no matter how small the benefits were that were obtained in the past, no matter whether it wasn't needed at all but was taken simply because it was available. No, Your Honor, I mean- It's still a heavily weighted factor in all those circumstances. No, I mean- If it's defined, isn't it defined as a heavily weighted factor? Sorry? It's defined as a heavily weighted factor. That's true, but then there can be countervailing heavily weighted positive factors. I mean, if you can explain this was just a small amount, I didn't really need it, I'm not going to use it in the future, of course that could be taken into account in the totality of the circumstances. And the only point I just want to make is- There aren't that many heavily weighted positive factors, are there? I mean, what I count are income exceeding 250 percent of the federal poverty line is a heavily weighted factor, as is current employment with income at least 250 percent of FPG, but I guess that actually doesn't add anything to the prior one because if you have it, whether you have it from rents or from current employment, it's still the same standard. You have to have 250 percent. Or has private health insurance that was not purchased- I'm not sure there are others. I didn't notice any. But there are a number of positive factors. There are other positive factors, but those are the only heavily weighted negative factors. Positive factors, yeah. Yes, that's correct. It's a rather long- I won't take up your time running the list of heavily weighted negative factors, which runs a bit longer. Right, but I mean, I will point out the rule, the proposed rule, I think it's table 34, provides some examples of people. And one example of a person that says it's likely not to be found to be a public charge is a young person who doesn't have health insurance but is in college and is getting an education and doesn't have dependents and is healthy and so forth. So not having health insurance, even though that's a heavily weighted negative factor, even though that person didn't have any heavily weighted positive factors, was nonetheless found to be not likely to be a public charge. And what I meant, just to get back to the question about a small amount of benefits, again, the adjudicator has to explain why he finds that way. So you have to identify the facts. It can't be speculation. So what facts a person would identify to say, I think you're going to use $10? It's hard to see, at least in the abstract. We'd have to rely on a particular case or case law to figure out the close cases, and there may be close cases. Well, we start with someone who doesn't speak English. At the time that they're admitted, notwithstanding that they have as much time as it may take, if ever, for them to get a green card plus five years before there would be an issue, but that's considered a negative factor. I guess we assume people aren't likely to learn English in that period of time, or we assume that the deck is so stacked against these people that they would never be able to make a living. But there are factors that are given weight to decide whether somebody is ever going to take advantage in any way of any of these benefits. And if the answer is yes, based on the totality of the circumstances, it's not a question of are they likely to need a lot. It's a question of is there any predictive, is it more likely than not on a predictive basis, that 10 years from now or beyond they may take advantage of these programs. That's what the totality of circumstances is supposed to address. Is it not? Yes, it is, Your Honor. I'm out of time. Well, could I ask a different type of question? Because we've been spending a lot of time, I think, on how this rule stacks up against the congressional intent expressed in ARERA. I've been puzzled about a different thing. I'd just be helped by your view on it. To what extent, there's a lot of talk in one amicus brief in particular and to some extent in the government's brief about the cost-benefit analysis. Is that significant? I mean, I thought that this was basically, that your main argument was this, we adopted this rule because it's in keeping with the congressional intent. Do we have to find that somehow it's rationally supported in some kind of cost-benefit analysis or is that a make-weight or is that something that matters to you? No, Your Honor. I mean, you don't have to find that it was sort of a mathematical cost-benefit analysis was required. In fact, it wasn't here nor is it clear how that would happen given how uncertain the various costs and benefits ultimately are, the costs, at least, ultimately are. But is cost-benefit, does that even matter? If we were to find that or conclude, I'm not sure how one would go about doing this. But if it were the case that the costs to society, economic and otherwise, of this rule had not been adequately considered by the agency, in your view would that matter at all or is that something we just shouldn't bother even thinking about? I mean, Your Honor, I don't think it would matter at all. However, the reason we discussed it is because plaintiffs in the district court were concerned about the agency's alleged failure to address the costs and here the agency did, as the Ninth Circuit found, at length address the cost of the rule. But the fact that it didn't come up with a specific definitive number is irrelevant. It just acknowledged the uncertainty and acknowledged the cost and that was sufficient under the law. Are you familiar with the brief of the NYU Institute for Public Policy Integrity? It was filed subsequent to your reply brief. I've read them. I don't know specifically which. That brief takes the position that, among other things, that there is an obligation in rulemaking to consider adequately the issue that Judge Lynch was talking about, to consider the cost-benefit analysis. And I think the point has nothing to do with whether this court would agree that the conclusion with respect to cost-benefit analysis reached by the agency was correct, but rather whether it was adequately considered. And with respect to things like the added cost that would be thrown onto a state's public hospitals because of poor nourishment or poor medical care, absence of medical care, from people who preferred not to get it rather than whatever. The people who abstained from taking advantage of available Medicaid wouldn't take it and people wouldn't take food stamps and the result would be poor nourishment, poor health, and the cost that that would throw on public resources. The brief takes the position that these things were simply blown away, were simply not considered. While there was some consideration of cost-benefit, a lot of the obvious costs, obvious but difficult to quantify, were simply not taken into account. And I'd be interested to know what you would say to that, but more than that, since you never had the opportunity to answer that brief, I would be very interested to have you file a supplemental brief responding, answering particularly the arguments made in that NYU brief. Your Honor, of course we'd be happy to do that. With respect to the specific arguments, the agency did address the question of the costs on hospitals and local governments and the public health. It noted it cannot quantify those, and I think it's important to keep this in mind. All of these helps stem from alleged disenrollment in medical benefits. Now, at the time people are applying to adjust status, they're not, and that's the primary group we're talking about here, or admitted at the border obviously too, but they're not eligible for Medicaid and they won't be for quite some time. So the people who are disenrolling right now are people who are not subject to the rule. They're people like potentially refugees, asylees, people who already have their green cards. So the agency, in responding to that very point, and it made a number of responses, but one it pointed out is that once they, you know, we're going to provide clear guidance on it, and once people learn the effect of the rule, they should re-enroll it once they realize they're not subject to it. So the idea that, you know, and of course if the agency concludes they're likely to use Medicaid later, they will be excluded and won't bring about these costs. So doesn't that bring about really everybody, the rule makers and us ultimately when it's in the record, having a need to understand what the impact of this is? I mean, here we're getting a respected amicus argue on the one side, and you're saying, well, that's really not going to apply. Yes, I mean, look, the agency recognized that there would be people who would disenroll, including people who were confused and not actually covered by the rule. It took steps to mitigate that, including by issuing clear guidance or planning to issue clear guidance. But it ultimately concluded, I think as Your Honor was getting to, that the policy of, you know, furthering Congress's clear intent and policy outweighed, and as the agency put it, the potential health benefits of, you know, the long-term difficult-to-quantify potential health benefits of removal. The SILEs, I'm just trying to understand this, people who have temporary admission or withholding of removal or asylum do not have green cards, right, at that moment? Yes, they will apply. They will apply eventually for green cards. And while they are not in green card status, they have eligibility for the benefits. And you're saying they shouldn't disenroll, notwithstanding that if at some future point they apply for a green card, that previous receipt of benefits will be held against them or not. It will not. I mean, if we're talking about refugees, SILEs, because when they apply for an LPR, they're by statute excluded from the public charge provision. I see. So they're excluded from the public charge provision. They're not just excluded from the diseligibility for benefits. Right. Got it. I understand. So they have no basis. There's something I'm missing here. Looking at the people who are adversely affected by this rule because they took benefits in the past, they took benefits during the prior three years, if those persons had not taken those benefits, their circumstance would be different. If they had elected not to take them and perhaps compromised their health by virtue of not taking them, not getting proper nourishment or not getting proper medical care, they would be ‑‑ what am I missing? Okay, well, just one thing. They must have been eligible to get the benefits if they took the benefits. One thing would be ‑‑ They also could have decided not to take the benefits. One thing, just the way the rule works, it says clearly in the rule itself that we don't consider any benefits received before the rule went into effect. Yeah, but ‑‑ So if someone has done it the past three years. In the future. In the future, yes. People at a time when they have the choice either take the benefits because they're available or don't take them for whatever reason, they have that choice? Yeah, but I don't know that there are many people in that category because they won't have been eligible to receive benefits before. So that might be a factor that doesn't come into play very often. I mean, there may be some unusual circumstance where someone would somehow become eligible and receive the benefit, even before they have their green card. But that's, as you know from the statute itself, it's rare for that to be the case. But, of course, if someone did not take some benefit that they might have been eligible for, I don't know what it is, and the result is that they become ill, then you might predict that in the future they are likely to take advantage of the benefits, right? I mean, it's probably not a good strategy to become seriously ill as a result of ‑‑ I mean, that has been part of the public chart. Yeah, of course, yeah. If someone's going to be seriously ill, that increases the likelihood. I'm just trying to figure out who this all is aimed at, and I'm going to be asking the other side as well, like, is this all symbolic? Or does this actually have bite on people in real life? You're kind of suggesting it really doesn't have that much effect on people. Well, I mean, certainly there's a prediction about whether you will in the future be likely. So all I'm suggesting is for disenrollment ‑‑ Disenrollment issue is a different issue. That's much smaller than I think everyone ‑‑ or shouldn't be an issue. People might be disenrolling, but they don't need to be. I have one other question, which is we have been presented, as we've been all getting ready to hear this argument and make the arguments with information, data from other government agencies, executive branch agencies that call into question some of the assumptions that appear to underlie the rule. What should we, in wrestling with the outcome of this case, do with that information? Well, I mean, if Your Honor is referring to the SSA's recent rule, you know ‑‑ people who don't speak English are about as well employed as people who do speak English, that sort of thing. Well, I think the SSA addressed that very point in their rule in which they made clear that they were not looking at the same statistics as DHS and they weren't looking at it for the purposes of evaluating whether people would have work that was sufficient to meet their basic needs to avoid becoming likely to be public charged. So it's just a different ‑‑ I mean, we've all been employed, or at least many of us here have been employed. Employment is employment is employment. Well, I think even in that SSA rule, they noted that participation in the labor force is lower for people who are not English speakers. And again, it's just one factor in the totality of the circumstances. And there was ample evidence in the record that, for example, lowering English proficiency is associated with higher unemployment and higher benefits use. More discrimination, perhaps. Thank you, Your Honor. I'm sorry if I'm asking you to repeat yourself, but I'm confused by the answer you were giving just previously. You seem to be saying just now that the rule doesn't really have any effect because prior to their application for a lawful permanent residency, they're not eligible for the benefit. There's no instance where the person has the opportunity to choose whether to take the public benefits or not? Your Honor, I want to be clear. I'm not suggesting that the rule has no effect. It's a prediction about whether you will use it in the future. So in that prediction, it's different than the current rule. But when are the circumstances when somebody could have the choice of take the public benefit or don't take it? Not until after they've received their green card plus five years. I mean, generally speaking, there are exceptions and so forth, but generally speaking, not until after you've got your green card and you've been here for five years. So at the time you're applying for your green card, which is when the public charge or when you're being admitted at the border, at that time you are not likely to have been receiving benefits or have the option. So my only point is that when we talk about disenrollment and people leaving Medicaid, it's not people affected by the rule. It's not at the moment that they're applying because they won't have been eligible. It's people who are confused, perhaps, about the rule. But the rule will have an effect, of course, because it's predicting going forward. What about a person who has been in the United States in the past and has received these benefits and then has left the United States for a period and then returns and seeks admission at that time? Your Honor, that is perhaps an example of someone's past benefit use, but if it was many years in the past, that would be something that would be considered. It depends on the amount, the type of benefit, of course, and all of that, and if circumstances have changed. But, yes, that's perhaps an example of someone. And a green card holder who leaves the country for a vacation and comes back is not regarded as seeking admission. You have to be away for at least six months. So that's a relatively small number of people, but there are some people who conceivably would have been here long enough to be eligible for the benefits, have taken the benefits, and then because of some need to be out of the country for a period of time, come back in. That's one category. Just describing it makes it sound like it's not very many. But that should be a pretty small category. Your Honor, is there no further questions? Thank you, Mr. Sinzat. You've reserved three minutes for a vote. Ms. Vail? May it please the Court, Judith Vail for the states and New York City. I will start with why the rule is contrary to the INA, and my colleagues representing the private plaintiffs will focus on the arbitrary and capricious and the other preliminary injunction factors. Of course, we're happy to answer questions about our particular parties. For over a century, the term public charge has always meant the truly destitute, individuals who are unlikely to subsist without relying primarily on the government in the long term. It has never been understood to mean people who have jobs, who make over the poverty line simply because they may temporarily use any amount of benefits that are designed to improve their lives or get through a short-term emergency. And the final rule goes far beyond that settled scope of the term public charge and beyond any reasonable interpretation in at least three key ways. By targeting individuals who do work and who make incomes over the poverty line simply because they may use supplemental benefits to boost their health or economic opportunities rather than to subsist. Two, by sweeping in nominal and temporary benefit use, even for just a few months under the aggregate counting system, just to get through a short period of financial strain. And finally, Who are the people who are adversely affected by this rule? What are the categories of people who were eligible to receive those benefits and therefore took them and therefore will be harmed in the future by reason of having taken them? What categories are those? I want to clarify, the people who are affected by the rule is far beyond people who have taken them in the past. So anyone who's applying for LPR status When I say in the past, I mean in the past of the moment where the government has a decision to make about it. I don't mean in the past from now. Sure, sure. I mean prior to an application for something in the future. Right. Well, prior to an application, LPRs are eligible for Section 8 without a five-year waiting period. They also, they can get Medicaid or SNAP usually after a five-year waiting period or after working for 40 qualifying quarters or becoming a citizen. So it is true that there are not so many people, except for Section 8, there's not so many people who, before they get LPR status, will have probably taken the benefit. However, that's not the definition in this rule. That is one factor. But the definition, it transforms it to mean that if an official, DHS official, thinks you are likely to take any amount of these benefits at any point in the future, even after you are an LPR, even after you are a citizen, when you are definitely eligible for Medicaid and SNAP and Section 8, even that is a categorical determination that you are a public charge. And the past benefit use is a heavily weighted factor, to be sure, and there are other factors as well. For most people, the prediction would be made not on the basis of their having taken public benefits in the past, but on some other basis. Yes, it would be based largely on the other factors, many of which drive at, for example, pure eligibility for benefits or English language proficiency or the heavily positive factors that are looking at whether you make far above the poverty line. And there are many ways in which both the definition transformation and the factors go far beyond the established meaning of public charge. And the Supreme Court has made clear in cases like Clearinghouse and Helsin that when you have a term of art like this that has an entrenched meaning, the agency needs to stay within the scope of that meaning, even if there is some ambiguity or play in the joints, and they need to stay within reasonable interpretation. They cannot just abandon the established meaning. And that is what's going on here because the rule will sweep in with that prediction about benefit use, people who work and make significant incomes over the poverty line, for example. Can I ask what the standard is under the law for a settled interpretation? I mean, you would agree that this is not the case that one sometimes encounters when interpreting what a statute means, that Congress reenacted the statute after, for example, the Supreme Court had clearly interpreted it to mean X, and now the government comes in and says, oh, you should interpret it to mean not X, and the response of the courts is yes, but Congress implicitly adopted the settled meaning because the Supreme Court had said it means X. That's not this case, right? I agree with that, though I do think there is a settled meaning that had been established, not through just one Supreme Court case, but through over 100 years of interpretation by the courts and by the BIA and the AG in cases like Partoonian and Matter of Lopez, and those came before the 99 guidance. And what those cases establish is a scope, certain principles that have been maintained for that time, that we are looking for public charge, we are looking for primary subsistence in the long term. There may be some ambiguity in that, but what you can't do is just abandon that altogether and start targeting people who use benefits that are not necessarily designed. And there may be a couple of at least outlier cases that don't fit that consensus. Sure, there might be outlier cases. You're pointing to a lot of administrative and judicial decisions over the course of a long period of time. Yes. Is there any case that you can point to where we or the Supreme Court, or if necessary any court, has taken that kind of view of what is a settled meaning? That is to say, looking at a broad sweep of history, there are lots and lots of judicial decisions. There's almost nothing to the contrary. They don't all say the same thing, so it's not clear that there is a settled meaning, but there is some clear core to all of those cases, and that represents a settled meaning. Is there something you can point to where the canon of interpretation that you're relying on has been applied to that kind of situation? Well, I do think there's sort of margin of cases like Gagow and Howe from this court that were applying it in individual cases and announcing these sort of principles. But then when you get to cases like Hartoonian and Martinez-Lopez, which are BIA and AG cases after a long sweep of cases, we're talking about in the 60s and 70s, where they're saying, look, based on the history of everything that's come before, in Martinez-Lopez they said a public charge is not somebody who is an able-bodied person who can work simply because they might take some public credit. Okay, so you're saying that those are cases that might support a conclusion that there was a settled meaning. They might be Supreme Court cases, but they're cases of the administrative agency charged with interpreting the statute to which the settled meaning rule applies that would establish a settled meaning. But I guess that's a slightly different proposition than the one I asked about. I wasn't asking you if there is something that looks close enough to the paradigm, wonderful case where the Supreme Court has decided something and then Congress reenacts the same statute the next day. I'm asking do you have a case where the settled meaning rule was applied to something like what you started with, which was not we're hanging our hats here against Hartoonian, but if you look at 100 years of history, 100-plus years of history, all the cases establish at least some common core, and then Congress throughout that period is reenacting the statute. Is there a case like that where a court has said, oh, yeah, the settled interpretation canon applies there? Well, I think a lot of the court cases are from a little bit of an earlier era, like Gagau where the Supreme Court— I'm not asking—I think you're misunderstanding my question. I'm not asking what kind of case supports your view of what the settled meaning of public charge is. I'm asking is there a case in which a court has applied the canon of interpretation to this somewhat more ambiguous story. I apologize. I did misunderstand. Yes, the Cuomo v. Clearinghouse case from the Supreme Court, I think, is a very good example of this exact principle. There it was the term visitation rights for banking institutions, and the court said this is a term that has a very long statutory history, a very long history of various courts saying various things, and what we can glean from that is that there is an established scope for this term, and the agency in that case was far outside the scope, and so that failed Chevron step one. And I think cases like Utility Air are not quite exactly what you're saying, but is another example of the court saying there is a scope or a reasonable interpretation for, and when the agency— Okay, so that answers—I just wanted to know, is there a particular case I can look at that would be helpful in deciding whether you're right about how the settled canon works? Yes, yes. Apologies for that. And I think to further illustrate that we are in the place where the agency is going so far outside, like in Clearinghouse, we do know that many people are eligible for these benefits who work, who take them. More than 60% of non-disabled adults on Medicaid work, many of them full-time. For Section 8 in New York City, it depends on the area income, but in New York City you can qualify if you're making up to $53,000 a year, and once you qualify you can retain your benefit at up to $85,350 a year. That's in the joint appendix at 126 and 133. And SNAP in 2017, 58.7% of households that did have one non-citizen in the household also had incomes. And what these figures show in part is that Congress developed these programs to not just provide basic subsistence, but to also invest in people, to help them simply improve their health, their nutrition, and their economic opportunities, which is good for the recipients, but also for them to be able to contribute more to the workforce and the economy, which goes back to the purpose of public charge, which has always been, yes, to exclude those who are truly destitute and who won't be able to work and contribute, but to encourage and actually give some help to those who can come and contribute even if they might earn relatively modest wages. And another way in which this goes far beyond the scope is the temporary use point, that the aggregate counting system makes it so that if an official thinks you are likely to use two benefits in six months at any point in your entire life, that's enough to make you a public charge. And what that means is it's not that the official is going to predict whether or not you're going to get in a car accident. What they need to predict is do you have so much financial strength right now when you apply to adjust that you can basically know that you won't ever need two benefits for six months just to get through something like a sudden job loss, even if you are somebody who is likely to get back on your feet very quickly. And in 1996... The interpretation in a lot of these cases that you're referring to over the history is actually rather more striking even than you're suggesting. It's not just a question of is this person someone who has sufficient resources that they're likely to get back on their feet if they suffer a temporary setback. It's pretty much an able-bodied person. There may be the depression, there may be no jobs out there, but this is not somebody who is disabled from work, so let them in. That's right. I mean, that was the Gagow case. And I think in many of these cases the folks who said they're not public charges had very little money, sometimes didn't speak English, but they were able just to show I'm not likely to be institutionalized, I am able-bodied, I am healthy, I am here and ready to start working, and that was enough. What do you make of Congress's response to Gagow? Because I'm not sure I understand that response, but it sounds like Congress said something that expressed some kind of disapproval of that because they moved the public charge from the place where it had been, which was something that contributed to that Supreme Court decision, to somewhere else. They did make that move in 1917, but this court made clear in the Ioria case that what they did seem to want to change was the idea that an external factor, like a severe depression, couldn't be considered. But what they didn't change was the idea that whatever factors you're going to consider, whether it's a mental health issue that's personal or an extreme depression, those have to lead to you're likely to be primarily dependent in the long term. The argument here then by plaintiffs that all of these things that, or a large number of these things that the government, DHS, has said are predictive aren't really predictive? That is one of the arguments. They're not really predictive. But I think one of the reasons why they're not predictive is the real nature of the programs themselves, what Congress did with these programs, how the benefit agencies have understood the programs. I refer you to the Public Justice Center amicus brief, which I think goes through some of this in great detail. And you can see also how broadly this rule is going to go, and that it is going to have real bite for many people. This is a transformational change. For the past hundred years, about 1% or fewer of LPR applicants have been deemed public charges. But 40% of the New York City population uses Medicaid, 20% uses SNAP, 94% of noncitizens have at least one negative factor, 42% have at least one heavily weighted negative factor, and 100% of LPR applicants are applying for LPR status, which is now a negative factor under the policy guidance. Let me ask you one other thing. You mentioned three things that you thought were particularly problematic. You never got to the third. The third, I think, was going to be the receipt of non-cash benefits, that this is something you think is inconsistent with the history? The third was the categorical nature of this, of the prediction, that as long as they predict it for any point in your life, that's it. The cash, non-cash, I don't think that cash in kind is really a distinction that necessarily drives this. I mean, there is in kind benefits like long-term institutionalization that do count. That was the thing I was going to raise because I thought there was an argument being made that one of the problems with this regulation is that it counts non-cash benefits, and that puzzled me for exactly the reason you just suggested. Yeah, it's not non-cash. I think that's just like a loose term that gets used sometimes. It's not that distinction that matters. What matters really is what the program that Congress designed is about, and what we call cash benefits like SSI and TAMP are designed for those who almost always make less than the poverty line and usually do need that cash assistance to just have enough income to survive. Whereas supplemental benefits, there may be some people, there may be some people who use supplemental benefits in combination with cash assistance to survive, but there are also many people who don't, who take the supplemental benefits simply because they're entitled to, simply because even though they make over the poverty line, it will improve their life to take a supplemental benefit. Someone might be able to afford an apartment in one neighborhood but use Section 8 to get to a neighborhood that is much closer to their job and much closer to transportation.  But use SNAP to buy fresher produce and more nutritious food. And what that shows is that benefits have changed over time, but not necessarily in the way that defendants in the Ninth Circuit State Order say. Congress has expanded benefits, made them available for purposes that don't have anything to do necessarily with subsistence, and that continued even through to 1996 when Congress had a very clear choice about what to do. Congress had a choice. It did have a public policy concern about self-sufficiency and incentives to immigrate, and what Congress chose to do was to address that through very detailed and specific provisions about eligibility, income deeming, and affidavits of support. And what Congress affirmatively rejected was the idea that it was going to change the meaning of public charge. It actually rejected a proposal to do just that, almost exactly what DHS is trying to do now. And that proposal was not something that died in committee and never really got any attention. It actually passed the House and then got rejected in the Senate because of a threat of a presidential veto because there was concern that this was going too far in attacking public benefits. And cases like Brown v. Williamson have made clear that an agency does not have authority. When Congress rejects one regulatory path, the agency does not have authority to come back and try to just do it itself. And one of the sweeping problems with a lot of these arguments about the various 1996 provisions is that it is using hidden meanings and inferences to try to draw a really vast transformation in immigration law and benefits law. But if that's what Congress had wanted, if it wanted that kind of transformational change, it would have just said so directly. It had every opportunity to do so. It knew how to do so both because it rejected proposals to do that in 1996 and 2013 and because it's clear from the 1996 provisions that they knew how to talk about different kinds of benefits when they wanted to and to draw these kinds of distinctions very carefully when they wanted to. The proposition that you were just relying on in your last statement seems to me to be quite tenuous. There are so many reasons why Congress might not adopt a provision and it seems to me hard to justify the proposition that if a new agency interpretation or a new rule, agency rule, whatever, is otherwise within the power of the agency to adopt, that it should make a difference that Congress at some point in the past had faced the same question and not adopted it. I mean, the reason for the failure to pass the Congress in the previous session might have been because of the inclusion in the same bill of some other provision or a thousand unlimited number of other reasons why something didn't pass. And if the thing is within the agency's power under the Administrative Procedure Act, should it really matter that Congress at some point in the past did not adopt a similar provision? I think it is at least one piece of evidence as to what Congress was thinking, particularly when defendants are using the 1996 act to say that Congress must have meant all of these things. I think it is important to realize that Congress actually rejected that approach and did something affirmative. They enacted very specific provisions to address the policy concerns and the policy statements that the defendants rely on actually specifically refer to affidavits of support and benefits eligibility as the things that Congress was going to do at that time. At least one of your points is that whatever else is true, the fact that Congress specifically rejected a plan to do what the agency is now doing undercuts the argument that we should draw from the things that Congress did do at the same time that it decided not to do this, that doing this is what they really wanted, and that's an affirmative reason supporting the legality and appropriateness of the agency's action. Yes, absolutely. You're trying to make also a broader argument, but I did want to make that distinction that that's one point, and then you're making a second point that you think at least that in the context of the whole sweep of history, et cetera, et cetera, Congress's decision not to do this lends some further support to the idea of application of the settled interpretation canon. Yes, that's absolutely right, not to draw those inferences. And I'll just further add to that that at that 96th point, there was also Congress was making these choices at a time when there was over 100 years of established meaning, and it was aware of that meaning. We know that from the 1952 legislative history, and there was just so much law on this, including the 99 guidance that was in effect at that time, but including the BIA and AG decisions that Congress was adopting the established meaning of public charge again, yet again, while making these other affirmative choices about what it wanted to do. The next thing is the 1999 guidance comes out, and for two administrations of two different parties, nobody says, oh, my God, this guidance is inconsistent with what Congress obviously wanted in 1996, but for the failed effort to change the law again in 2013, Congress certainly doesn't come back and say, what are you guys doing? This is inconsistent with what we specifically did in 1996. That's absolutely right, and the 99 guidance came out pretty, you know, only a couple years after the 96th law, and the 99 guidelines, I'm not saying that they can never change it, but the 99 guidelines were kind of a capstone of all of this history. The 99 guidelines say that they were reviewing all of the history and all of the case law that was out there and drawing on those principles to reach the primary subsistence. But it is, as you say, it is, first of all, a guidance. It's not a notice and comment rulemaking, and it is, even if it were a notice and comment rulemaking, they could change. Yes, I agree with that, but I think it is at least still, yet again, another piece of evidence as to how the agencies had been interpreting this, and not just in 99, but all along. I think 99 was sort of the culmination of how the agencies had been interpreting it for quite a long time. In answer to Judge Lynch's question, after some confusion, you gave him two cases answering his question. One was utility air. What was the other? Cuomo v. Clearing House, and I believe it's cited specifically in the House of Representatives' amicus brief. Thank you, Ms. Hale. Thank you. Mr. Hurwitz? Thank you, Your Honors. Good morning. Jonathan Hurwitz for the Plaintiffs in New Mexico Road case. I want to add one case to the question that Judge Lynch asked about cases from the Supreme Court applying the notion of settled interpretations. The Brown v. Williamson case, I think, is also in that category. I'd like to address the harm question and the harm that will be done by the rule. There were some questions earlier on, particularly in the government's presentation, and I'd like to try to clarify some of the points that were made there. So the district court found that the rule will expose individuals to economic insecurity, health instability, denial of their path to citizenship and potential deportation. That's a finding that's essentially uncontested. The DHS itself concedes in the rule that the rule will cause hundreds of thousands of noncitizens to forego benefits to which they are lawfully entitled, including food, nutrition, and housing. We think it greatly understates the severity, but that's DHS's estimate itself. Now, to clarify... What categories are they in, the ones who will forego the benefits? So most of those people, Your Honor, are not people who are subject to public charge. Most of those people... Because most people who are subject to the public charge rule do not have LPR status, of course, because it's a rule that applies to getting LPR status. And most people who are subject to public charge and do not have LPR status are categorically ineligible for the benefits at issue. There are always exceptions, but that's generally speaking the case. So what you're talking about here is people who, in large measure for a variety of reasons, because of confusion about the nature of the law, because of confusion about the benefits, have choose out of concern for their immigration status not to accept benefits to which they're entitled. But that's based on their confusion, right? I mean, it's not because the rule is acting to bar them. But, Your Honor, it's a predictable consequence of the rule. DHS itself predicts that. The expert reports that we've submitted in the record predict that. The American Medical Association and its amicus predict that. I don't think there's any question. And that prediction is based on... We know that that's going to happen for at least two reasons. One, because when the law changed in 1996, there's evidence of an enormous chilling effect just in the same way. Many, many people who were not obligated to forego benefits chose to do so because of uncertainty. And then more recently, in the lead-up to the publication of this rule, we know that many people withdrew from benefit programs or chose to forego benefits. I think there's a study that said that one in seven immigrants, one in seven noncitizens, is in a family that chose to forego benefits out of concern from the rule. So the rule has that predictable consequence. And the census case, for example, tells you that the district court properly considered those predictable consequences of the rule. Can I ask one other thing? I think I'm correct about this, and maybe that's totally obvious, but I just want to make sure I'm right. This whole rule applies only to people who are seeking to immigrate to the United States legally? It only applies to people who are either seeking to immigrate legally or who are here and seeking LPR status legally. That's correct. In large part, this rule, the DHS rule, applies in most cases directly to people who are here in some other immigration status and seeking to adjust so that they have a green card. Right, so it's people who are taking, availing themselves of an opportunity otherwise available to legally become residents of the United States. That's correct.  this rule doesn't apply to you. Right, and does it apply to people who are applying for temporary visas, whether tourist or work visas or something else? It does. What we're challenging is the application of the rule to people who are seeking green card status. I see. But I take it at least as to tourists and people of that sort. There's already a provision that if it is predicted that they're going to overstay because they don't look like tourists, they look like people who want to be here forever, that's already something on the basis of which their application could be denied. And that would subsume anybody who might someday be expected to try to overstay and then switch to green card status and then need benefits. The very fact that you're already thinking that that's going to happen because they're going to apply for green card status someday is a reason to turn down their tourist application. This rule is not, to be clear, this rule is not about predicting whether someone will overstay. Right. That's absolutely correct, Your Honor. The people to whom the rule applies because they are seeking green card, then are you saying that the adverse impact of the rule on those people is not the part about having received benefits in the past but is other predictive factors? Generally speaking, that's right. Now, I will say one other thing. There are, for example, state benefits to which people who are not LPRs have access, have legal access. For example, in New York, there are medical assistance benefits for people who are not LPRs. Those aren't counted, but many people understandably are confused about whether what they're receiving is federal Medicaid or state Medicaid. There are states such as New York and California that tend to merge those things together, so from the user's perspective, you may not know whether you are in a federal Medicaid program or an entirely state-funded program. So for those people, to the extent that there's confusion about just which program they're in, it can affect them as well. I guess maybe I should ask the government this, but I think it would be very strange if you had a rule that said you were trying to predict whether someone is going to apply for any of these federal benefits, that it would somehow be not negative in some way under the totality of the circumstances that they had been receiving state benefits in the past. Right, and they do, in fact, ask. The form asks for those benefits as well. The rule says we're not considering it. The rule says they're not supposed to consider it. The rule says you're not supposed to consider it, but when you fill out the form, there's a long, very detailed form you have to fill out when you make your application, and that asks for all sorts of benefits that the rule says that the DHS employee who looks at that form is supposed to ignore. Now, I'd like to contrast that harm with the total absence of any concrete harm to the government here. What the injunction requires the government to do is simply to continue applying the field guidance, the field guidance that's been in place consistently since 1999, under standards that we submit have been the law for more than a century. The injunction does not prevent the government from denying admission or denying status adjustment case by case to anyone deemed likely to be a public charge under the standards of the field guidance. There's no claim of concrete harm here if the injunction stays in place while the litigation is pending. There's no claim of emergency national security interest. There's no claim of changed circumstances since the field guidance was published, and, in fact, the government concedes that the field guidance was a lawful exercise of the government's discretion, the agency's discretion. So the government itself concedes that the field guidance would be an entirely proper way for the government to assess applications for LPR, which, indeed, this administration has done... We're in the somewhat unusual position that even if we were to decide that the injunction should be... the primary injunction should be affirmed, it would not have any effect at all, at least in the short run, because any such ruling has already been stated by the Supreme Court. No immediate effect. There are, of course, many ways in which this can play out, and certainly I think... But we might decide your way and write such a great opinion that the Supreme Court decides that need not even consider the case and vacates its stay. We're confident of that, Your Honor. Yes. Is the scope of the district court's injunction, is that in your portfolio? I'd be happy to respond to it. Yes, Your Honor. You're talking about the nationwide injunction? I'm very dubious about the proposition that a district judge in one district and necessarily in one circuit can issue an injunction which will continue to have force even if courts... Say in the Second Circuit this happened, that a district judge in the Second Circuit issues an injunction, and that injunction by its terms will prevent a government program from going into effect in the Ninth, the Tenth, the Fourth Circuit, notwithstanding that the courts of that circuit may decide the opposite way. Right. Now, I acknowledge for the reason Judge Lynch indicated that the practical consequences of this issue in this case is probably going to be limited, but I do want to say a couple of things. I would be asking this question regardless of whether the Supreme Court had rendered that... Absolutely. And I think it's properly before this Court. So two things I would say about that, maybe three. One is Section 705 of the APA, 5 U.S.C. 705, expressly empowers the Court to postpone the effective date of an agency action while a dispute about the legitimacy of an agency action is pending before the Court. With no geographic limitation. There's no mention of geographic limitation in the statute itself. That's correct, Your Honor. And then, of course, Section 706 of the APA authorizes the Court to set aside... in fact, directs the Court to set aside on lawful agency action. I understand your answer about 705, but nonetheless, how is it appropriate for a district court to say, I don't care what the Court of Appeals in the Seventh Circuit and the Fourth Circuit and all the others say. Nationwide, this is stopped for those circuits as well as the one that I'm in, assuming that my circuit, my Court of Appeals affirms me. Right. Well, I guess a couple of things about that. One is it's the nature of our judicial system that challenges to agency action come before particular district courts in particular circumstances, and Congress has authorized the district courts to take that action. Yes, but it's perfectly possible to craft an injunction in a manner that will have effect initially nationwide, but then will cease to have effect in some other circuit if a court of that circuit decides to the contrary. I understand how it's appropriate to start out with a nationwide injunction, but my question is, why should the injunction be crafted in a way that it continues to have effect, notwithstanding that the courts of the other circuit disagree and say, no, this is fine. Right. I mean, to be fair, I don't think that happened here. The district court did what it did. That was before, and at the same time that the district court here enjoined the rule, every other district court that was faced with the question also enjoined the rule. The first time that a court decided that the rule ruled against the plaintiffs. No, if you write the injunction, how the other courts are going to turn out. Sure. And the fact that the rule was being challenged, the district court took it as a factor favoring nationwide injunction, that the rule was being challenged in numerous other districts in other circuits. That seems to me to be a factor in the opposite direction. To the extent that this is coming before the courts of another circuit, that's less reason, not more reason, for me to make a ruling that will govern what happens in those circuits. Sure. And I think to be clear, particularly beginning at the moment when those other circuits make their own decision. Sure. And I think what a district court should do, and we think the district court here did that, is consider what the scope of an injunction is that is necessary to afford complete relief to the plaintiffs in that case, taking account of the authority it has under Section 705. And I'm not saying that a court always has to act nationwide under Section 705, but it's authority that it has. And I think it's appropriate for the district court, as it did here, to consider what is necessary to afford the plaintiffs. Mr. Hurwitz, I know that this is not what you want to spend your time on, because in this case, it's got virtually no significance anymore. But we are still being asked to affirm the decision of the district court, and this issue of nationwide injunctions is significant to the rest of the world, if not necessarily in this particular case, independent of the context of this case. So I do have this one further question. I'll preface it by saying I hear Judge LaValle's point very clearly. I don't know that there are many injunctions that have been crafted in the way that he suggests there may be precedent for that. I don't know. And I would be at least initially a little hard-put to call it an abuse of discretion for a judge not to think of something that if nobody else had thought of it in the past, again, I don't know whether they have. But my question is, let's assume that Judge Daniels acted appropriately in light of the way the district court trend was going and in light of whatever the state of history is with respect to whether other courts had adopted a rather more elaborate kind of injunction. By the time we're here, and we know what has happened in some of the other circuits, it's not for us simply to decide, looking at it from the vantage of where Judge Daniels was, did the district court abuse his discretion. Would you agree that it's open to us to address what the appropriateness of a nationwide injunction is now in light of what other courts have in fact done? I think this court certainly could do that. And this court, I think, certainly could consider what other courts have done in deciding what the scope of an appropriate injunction is. Yes. I know you want to talk about other things than this that are more important to your client. If I can take two minutes on arbitrary and capricious, because there are two points that came up earlier in the argument that, to my mind, illustrate well the arbitrary and capricious nature of the rule. The first is the notion that was brought up by the court about what I think Judge LaValle, about whether or not you can fairly equate someone who receives benefits or is eligible for benefits with someone who needs benefits. And the arbitrary and capricious aspect of this is that I'm not aware of any evidence in the record that the agency had in front of it that people who receive benefits for the time and in the manner in which the agency says trigger a public charge finding that those people predominantly or exclusively need those benefits. And the record, given the small amount of benefits that can trigger a public charge finding, the amount of time, the level of income that people can have to be eligible for benefits suggests quite the contrary. The second point I want to make about... In fact, we might even have problems with the word need, right? As we've discussed earlier. That's absolutely right. And need is the agency's word. It's not our word. Need to public assistance is the agency's term. And that problem is multiplied by the way in which the agency aggregates benefits. So the agency, when it presents its rule, it says, well, if you are projected to receive benefits for 12 months out of 36 months, you're considered a public charge. But then the agency aggregates benefits. So it says if you receive two benefits, then the time is now six months, and if you receive three benefits, it's four months. So under the agency's rule, someone could be branded a public charge merely because they might in the future or are likely in the future to receive assistance for as little as three or four months after losing a job, undergoing a health emergency, or otherwise being subject to the vagaries of life. And that, again, is contrary to this agency's stated view that short-term and intermittent access to public benefits should not lead to a public charge finding. That's at page 41, 361 of 84 Federal Register. And, again, no evidence in the record... It's hard to understand why the agency couched it as 12 months when they then went in the small print and said it's really 12 payments, even if they are compacted into four months. I don't have an answer to that question, Your Honor. It's a good question. And, again, no evidence that receipt of multiple benefits over three or four months indicates a lack of self-sufficiency. And then the last point I want to make is English proficiency, which was brought up earlier as well. DHS tries to justify the use of a lack of English proficiency as a negative factor, as a strike against the applicant, by citing evidence that a claim shows that non-English speakers are more likely to be unemployed than English speakers or more likely to receive benefits than English speakers. But if you look at the data, regardless of which category of English proficiency you fall into, the vast majority of the people in that category do not receive benefits. And as the data that was published in the Social Security Rule shows, the vast majority, over 90 percent of people in every category who are of working age, in fact, work. And as Social Security found, and I think it's clear from the data they had, that there's no material difference in terms of employment between people who speak only English, people who don't speak English well, and people who don't speak English at all. And the reason it's that, it's the DHS's cherry-picking of data on that point and ignoring relevant data on the issue that makes the rule arbitrary and capricious. Can I ask you what we're supposed to do if we find elements of the rule arbitrary and capricious? I mean, you focus on that English language provision. And I realize this is part of a broad-brush attack in which you say there are all kinds of things that are arbitrary and capricious. But suppose we were to agree that counting English language proficiency as a negative factor is totally capricious, because even if, whatever the numbers are, 90 percent of people who come here without being able to speak English will work and be self-supporting, but 93 percent of people who come speaking English will. And we think, well, the point is you can't use that to say that all of those 90 percent are likely to become a public charge. But just pick that as one example. If there were one of the pieces of this that were arbitrary and capricious, that would not require the entire regulation to be invalidated, would it? I mean, to the extent there are specific rifle-shot problems with particular pieces, do we have the authority to say, well, those pieces are arbitrary and capricious and should drop out of this? I'm not aware of a case that has said that, and what the courts, as far as we can tell, routinely do in finding that a rule is arbitrary and capricious in whole or in part is to remand to the agency rather than to try to rewrite the rule. Right, because they're the ones that have to figure out if this has sent a keystone to the whole problem. Right, exactly. They can decide if the court decides that, for example, the only problem with this rule, and our view is it's far from the only problem, but if the court decides the only problem with this rule relates to English proficiency, it should be up to the agency in the first instance to decide what to do about that. And, of course, in the interim it should not be implementing the rule. It should not be using the rule. Thank you, Mr. Hurwitz. Thank you, Your Honors. Mr. Hammer, last but not least. May it please the Court, we'll have him in on behalf of the House of Representatives. Before I begin, I'd just like to thank the Court for granting the House argument time in this case. We've covered a lot of ground this morning. I hope to not take up too much more of the Court's time. What I'd like to focus on is that the Congress that reenacted the term of public charge in 1996 cannot have intended to allow the executive branch to rewrite the term in the way that it has attempted to do. And there are a couple of reasons why we know that that is true. And the first is one that was discussed by my colleague, Ms. Vail, and that is when Congress reenacts a particular statutory provision that has received a settled meaning over the course of a long history, we know that Congress intends to adopt and carry forward that meaning. And the Court need not just look at the history of interpretive decisions, although we think that those are squarely supportive of our position, but the Court should begin with what the Supreme Court has said is the fundamental canon of statutory construction that you look to the meaning of the term when Congress first enacted it. And in 1882, when Congress first enacted the public charge provision, I don't think that there is any serious dispute that that term was a term of art that meant someone who is primarily dependent on the government. It typically applied to wards of the state. Indeed, the text of the statute in 1882 was someone, quote, unable to take care of himself or herself without becoming a public charge. Congress told us what it thought the term meant in 1882, and it has meant the same thing since. At that time, the types of benefits we're talking about now were not available, were they? That is in part true, although, of course, there was the immigrant fund, which contemplated that immigrants who arrived here would need some temporary support, and we think that that's another reason why Congress can't have meant for small amounts of welfare received over a temporary period of time would make someone a public charge. But it is by and large true that the primary means of support for noncitizens was support, you know, by virtue of institutionalization. But that is, again, strongly supportive of our point, because all of those ways in which the government provided support for noncitizens at the time were ways in which it primarily supported noncitizens, so Congress can't have contemplated that temporary small amounts of support would qualify. Mr. Abrams, what are we to make of the fact, I mean, you say the meaning of public charge is informed by the original text of the 1882 statute, but that text was changed, right? I mean, originally it did say, I'm sorry, I had it here a second ago, but you just quoted it. Yes, people who are unable to take care of themselves without becoming a public charge. Unable to take care of themselves without becoming a public charge. But then that unable to take care language came out. That's true. It came out because Congress amended the statute to provide for a prospective inquiry, a predictive inquiry. It was someone that changed it to someone likely to become a public charge. So instead of as in 1882. Yes, but that doesn't change the fact that they could have said that we're predicting, what we want to predict is someone who will be unable to take care of themselves without being a public charge. It just skipped to public charge. Right, because at the time it was well understood that public charge was a term of art. It had this meaning that was confirmed by. It already had that meaning when. It was unnecessary to spell it out in any great detail, and that is by and large the answer to many of DHS's arguments about why didn't Congress amend the statute to define the term. Because the term had a well-understood meaning, and Congress didn't think that it was necessary to do so. My colleague identified, I think, two cases or maybe three cases that he thought supported his reading of the statute over the course of the last 138 years. None of them actually supports their interpretation. I mean, you discussed the Matter of B case. There's also, I think you referred to a Turner case. But that was a case in which I think the quote is, this is a person who is possessed of no property from which he can derive an income. He suffered from a chronic condition that was getting worse over time, and when suffering from ailments he will likely be incapacitated from performing any work or earning support for himself and his family. And then there was a reference to, I think, what was the Diamond case, which is a district court case from 1925 where the person admitted at the hearing that, I have been dealing in booze, bootlegging, breaking the law. I might as well own up to it. I couldn't live and support my family otherwise. And these are the best cases that DHS can come up with in the course of more than 100 years of precedent. And there's not just the absence of support for its interpretation. There's affirmative case law from the BIA rejecting its interpretation. And I think, Judge Lynch, you referred to what I think was probably the matter of Perez case, and that was a case where someone was actually receiving welfare at the time of their hearing, and the court said, the BIA said, no, that is not enough alone to render someone a public charge, and that just can't be consistent. Then what do you make of Mr. Sinzak's point that both Congress and, to some extent, the agency in the 1999 guidance refer to the idea that there isn't a settled meaning? What do we make of that? I understand those statements by Congress to suggest that this is a case-by-case determination. And when Congress declined in the INA in 1952 to create a definition, it said it wanted this to be done by case-by-case adjudication as it had been done since 1882, and it said we don't want there to be a strict definition of public charge because this is a totality-of-the-circumstances approach, and it's hard to predict ex ante all of the factors that may be relevant in a particular case. So I understand that. I mean, it's a Senate report, so take that for what it's worth. But if the court considers it, I think that it does not support DHS's view that it can now adopt a strict definition of public charge, which is what Congress itself declined to do in 1952. And then I think I do want to get to a few of the points that my colleague made with respect to the decisions that Congress made in 1996. Of course, in 1996, Congress was concerned with noncitizen self-sufficiency, but Congress does not pursue its policy goals at all costs. And the way that Congress dealt with this issue was by making noncitizens generally ineligible for welfare benefits with exceptions, and one exception was LPRs who have been here for five years. And DHS just does not in its rule, not in its briefing, it does not have a good explanation as to why Congress would make noncitizens eligible for this raft of benefits if Congress thought the receipt of any of these benefits was enough to make someone inadmissible at the outset. And I think that this sort of highlights a perverse result of the logic of this rule, and that is that the more generous Congress opts to be with respect to granting  the more discretion DHS has then to exclude that class of noncitizens at the outset, and I think that this is illustrated by what Congress did in 2002. Congress in 1996 generally made noncitizens ineligible for food stamps. After six years under that regime, Congress had a change of heart. It saw the negative public health consequences of that decision, and it said, no, noncitizens who are LPRs who have been here for five years should be entitled to food stamps. And it is inconceivable that the Congress that made that decision in 2002 thought that what it was doing was allowing DHS more discretion to exclude noncitizens at the outset by virtue of the fact that they were more likely to receive food stamps at some point during their stay here, and that's particularly true because, of course, the INS field guidance was in effect at that time when Congress made its decision in 2002. And then the last point that I want to make, which is one that, again, my colleague made but I want to emphasize, is Judge LaValle, in response to one of your earlier questions, you had asked a question about how many people would actually be affected by this rule, and the answer is that the rule is transformative because, of course, it's not just that you look to the class of noncitizens who have received these benefits in the past. The purpose of the rule is to make a prediction about who is likely to receive these benefits at any point in the future, and we don't know exactly how many people that will apply to because, of course, it just took effect. It's predictive, but we know that in the past this rule has applied to about 3% of people who apply. And we also know that- What aspect of the rule applies to? Sorry, it has applied to exclude. It has applied to exclude about 3% of applicants. The public charge rule leads to the exclusion of a single-digit percent, less than 5%. Single-digit percent. We heard 1% from them, 3% from you. Right. Low numbers. The numbers are difficult because multiple agencies administer the rule, but it has always been, since 1882, a very small percentage. And- On the basis of having previously received these benefits for the 12 hits? In the past- No, you're saying- No, because, of course, the rule in the past was not that the mere receipt of benefits was enough to make you a public charge. In the past, it was, you know, DHS was looking at a particular candidate, and they were asking, is this person likely to depend on the government in the long term? That's what they were asking, and they answered the question yes in about 3% of cases. Now, in the future, we don't know exactly how many people it will apply to, but we know that approximately half of the U.S.-born population of this country at some point in their lives receives one of the benefits, SNAP, public housing, Medicaid, that is enough under the DHS rule to label you a public charge and allow DHS to exclude you at the outset when you apply here, about half. And this is a transformational rule, and, of course, when this court is looking to a claim of Chevron deference, one of the things that the court asks is, how likely is it that Congress actually intended to give an administrative agency authority to make the change that it is attempting to make? And it is very unlikely that Congress in 1996, when it reenacted the same provision that's appeared in the law for more than 100 years, allowed the agency to implement what is, in effect, for the first time in the history of this country, a wealth requirement for people seeking to come and settle here. That is not what Congress had in mind in 1996. I'm happy to answer any other questions. I have a question about the definitions. The likelihood of becoming a public charge renders one inadmissible, right? That's right. Now, can one be inadmissible? What are the consequences of being inadmissible? The consequences of being inadmissible are it depends on—it depends. If you are seeking a visa to come to this country, I believe you can't get the visa. If you are already here and you are seeking to adjust to lawful permanent resident status, then you can't adjust your status. Now, anyone who is looking for a green card, whether they are applying in the first place abroad to come to the United States as an immigrant, not as a tourist or some other temporary status, anyone in that category who is seeking to become a permanent resident, this applies to because they have to be admitted to the United States. And anyone who is already here and is seeking for whatever reason to adjust, possibly from some other perfectly legal status to green card holder, that counts even if they don't have to physically leave the country and come back, as some people do, is my recollection. But even if they are allowed otherwise to adjust their status by staying in the country and applying for a green card, they are considered to be applying for admission, even if they have already been here for years and years. So anyone who is seeking permanent resident status is subject to this rule effectively. Can you become inadmissible when you have a green card? I don't know the answer to that question. I know that it's very complicated. I hope that it's an answer to your question to say that there is a difference, a public charge provision that renders you deportable, and that is that if you have been found to have become a public charge during the five years after your admission to the country, then you are deportable as a public charge unless you can show that the reason you became a public charge wasn't foreseeable at the time of your admission. And DHS, I actually think that DOJ implements that statutory provision, and they haven't changed it. So that statutory provision, the deportability provision, is still sort of under the 1999 field guidance. Does that mean that, is that part of this rule? It is not. But it is the case that someone who has a green card and leaves the country for more than, I believe it's six months, but for some relatively lengthy period, is regarded as seeking admission when he or she returns to the country, notwithstanding their green card, and this rule would apply to that presumably relatively small subset of green card holders. Yes, that is right. I don't recall the specific number of months, but I do believe it's a number of months, and that qualifies as an admission even if you have already been admitted. I mean, the immigration law is filled with words that don't mean what you would think they mean. Yes, I have noticed the same thing. Thank you, Mr. Sinzak. Oh, excuse me, Mr. Haberman, I apologize. Mr. Sinzak, you're up. People get us confused, John. Just a few more points. Just to clarify, asylees and refugees are about half of the people who apply for green cards, and they're not in part of the rule. But the bigger points I want to hit on, the acceptance canon is, of course, about congressional intent. What did Congress intend? And we know that Congress itself in 1950 surveyed the landscape and concluded that there was no set meaning for this term and deliberately chose not to adopt one. And similarly, the BIA and Congress or, I'm sorry, the BIA have said that the term is in the U.S. and international guidance and so forth. And Plaintiff's mentioned GEGEA, but we also know that the, as this court recognized in the Oreo case, that Congress, as soon as that case came out or shortly thereafter, Congress overruled it by moving the statute. Except that then our, not just our court, but lots of courts seem not to have paid any attention to that change. If Congress did intend that to be a change, the courts didn't notice. Some didn't. I agree that there was some confusion over that. But, I mean, I know some judges don't rely on legislative history. There is a Senate report saying why they did it, and it was to overrule GEGEA. And so, in any event, I also want to talk a little bit about the 1996 proposal. In terms of congressional intent, obviously it's dangerous to rely on rejected proposals. Here the Senate passed the bill. I believe the House had passed something similar in an earlier bill, and it was, as Plaintiff's noted, the president that objected. And then Congress didn't turn around and adopt a narrow definition. It left the term undefined. And so I think taken from that is that it intended to retain discretion for the executive branch. You know, just in general about Congress being, allowing benefits and authorizing them, Congress can, of course, define the term public charge any time it likes. It can also, as it has done in the past with respect to battered aliens, with respect to amnesty programs, it can say we're making people eligible for these benefits, but they're not to be counted towards the public charge. It's done that in the past. It can do that again. And, yeah, and then just finally one point. I think the point was made that 50% of U.S. citizens would qualify. That's actually inaccurate. As a statistic, it's inaccurate. The study, in fact, said it can't estimate how many would meet that 12-month threshold under the rule. But even putting that aside, aliens are, of course, subject to any number of requirements, including vaccination requirements and others that U.S. citizens are not subject to. I hope that's not their point because if it is, you'd be completely right that Congress can make rules that would apply to aliens, don't apply to citizens. But I don't think that's the point they're making. The point they're making is if as many as 50% of the people in the country, and I take your point about the 12 months, at some point in their lives rely on or at least accept or receive these benefits. That does suggest that it's a rather dramatic change to go from a rule that has been applied for a very long time in such a way that a very tiny percentage of potential immigrants are found to be public charges to one that potentially could lead to the exclusion of as many as 50%, or maybe more if it's true, as the regulations presume, that people who don't speak English or who are otherwise new to this country are more likely to take advantage of these benefits. That is a pretty striking change, is it not? Governor, I agree that it is a change. Obviously, it's a change. The agency, though, and Congress was quite clear. I know there are counterarguments that in 1996 it did not want aliens relying on public benefits. It wanted them relying on their own private benefits. We've had that discussion. I'm thinking more of the 1952 codification and the fact that Congress said, well, we'd just as soon leave this where it lies rather than create a hard and fast definition of public charge. It's a little bold to say that what they intended to do was to leave it to the executive branch to make exactly that decision, to have a hard and fast definition, and one that potentially would multiply by a factor of 10 times or 20 times the percentage of people who are subject to this exclusion. That doesn't seem exactly to be supported by the idea that it's working well enough the way it is. We don't need to have a hard and fast definition. Let's leave it to totality of the circumstances. That's a far cry from what this rule does, isn't it? Well, I mean, I guess my main response would be in 1950 the Congress made clear it was leaving it to the discretion. And there were sources. I know we talked about some of the cases already, but like Black's Law Dictionary Treatises that provided a much broader definition. And Congress said, you know, we recognize different courts, different agencies have applied varied standards, even different standards in close proximity to one another, and we're not going to define the terms. So I think Congress understood it had a broad interpretation and was leaving open, leaving it up to the agency or the executive branch to determine how far it should extend. And the only question here is whether, under the 1996 law, whether this is a reasonable interpretation of Congress's intent. And we believe it is.  Yes, I mean, obviously we agree or we disagree that a nationwide injunction is appropriate here for the reasons your Honor has already mentioned. It's inequitable, and I think this case is a perfect example. The Ninth Circuit and the Fourth Circuit have held that it should go into effect in the district court's injunction if the warrant stayed it would have overruled effectively the rulings of those courts. That it should go into effect, it's also not required by the APA. The APA is equitable relief. So, as the Supreme Court said in Abbott Labs, equitable defenses can be interposed even in an APA case and so forth. So, yes, we believe that if the score were to affirm. The district court said something to the effect that there was need for a uniform interpretation of the immigration laws. What about that? Your Honor, that is, you know, up to the agencies to decide on that. In fact, I would point out that until last Monday the rule wasn't joined in Illinois and DHS was prepared to implement the rule differently in Illinois. And as I noted, Congress itself noted. Except DHS then went to the Supreme Court. I mean, that's precisely the argument that it shouldn't have to do this in Illinois. Yes, I mean, on the merits and so forth. But it wouldn't have been impossible, I guess is what I'm saying, for DHS to have done it. They carried it out. Yes, they could have carried it out, and it was their determination. And Congress itself in 1950 recognized that there were different interpretations and different localities and so forth, and it didn't have a problem with that back then. So, yes, we strongly assert that if the score were to affirm, which we don't think it should, but if it were, it should limit the injunction to the plaintiff's states. Generally speaking, we do not have a uniform rule of anything. That's also true, Your Honor. The Supreme Court irons out differences. Yes, and agencies apply different rules in different circuits in various contexts. We do in the asylum area. Thank you, Your Honor. Thank you. Thank you, Mr. Senczak. Thank you, all four of you. Well-argued, helpful arguments. Thank you for coming up, Mr. Habermas, as amicus. We're going to take a short recess and allow the masses to disperse if they're so inclined, but allow the microphones and cameras to be removed. So we will be back, and then we will be hearing the argument United States versus Hawaii. So if counsel want to be at the table, that would be great.